# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Thomas Walker and Cathy Cataldo,

    Plaintiffs

v.

City of North Las Vegas, Officer Paul
Maalouf, and Officer Travis Snyder,

    Defendants

Case No.: 2:14-cv-01475-JAD-NJK

**Order re: Summary-Judgment Motions
and Related Matters**

[ECF Nos. 164, 166, 184, 199, 202, 206]

This case arises out of the shooting death of plaintiffs Thomas Walker and Cathy

Cataldo's dogs by North Las Vegas Police Department (NLVPD) Officers Paul Maalouf and

Travis Snyder while the NLVPD's Narcotics Bureau executed a warrant to search the plaintiffs'

home. Discovery is closed and five claims remain to be determined: unreasonable seizure in

violation of the Fourth Amendment against Maalouf and Snyder; failure to provide adequate

training and supervision in violation of the Fourth and Fourteenth Amendments and Nevada law

against the City of North Las Vegas; and both negligent and intentional infliction of emotional

distress under Nevada law against Maalouf, Snyder, and the City.[1]

Defendants move for summary judgment on all five claims and plaintiffs' demand for

punitive damages.[2] Plaintiffs move for summary judgment on their unreasonable-seizure claim

and Maalouf and Snyder's qualified-immunity defense to that claim.[3] Each side also moves for

---

[1] ECF No. 88 (second-amended complaint).

[2] ECF No. 164.

[3] ECF No. 166.

sanctions against the other side under FRCP 11.[4]  Finally, plaintiffs twice object that six of defendants' summary-judgment exhibits are inadmissible and move to strike them.[5]

Except for one police report and some photographs, I overrule plaintiffs' objections to defendants' summary-judgment evidence.  I deny the parties' competing motions for sanctions.  I also deny plaintiffs' motion for summary judgment.  But I grant defendants' summary-judgment motion in part and, finally, order the parties to a mandatory settlement conference on plaintiffs' remaining claims for unreasonable seizure and intentional infliction of emotional distress.

## I.  Plaintiffs' evidentiary exceptions are largely overruled [ECF Nos. 184, 202].

Plaintiffs twice object to six exhibits that defendants provide to support their summary-judgment arguments, contending that this evidence is not admissible and should be struck.[6]  At the summary-judgment stage, the focus is not on the admissibility of the evidence's current form, but on the admissibility of its contents.[7]  When an objection is made, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."[8]

Plaintiffs object that the photographs of the exterior (ECF Nos. 165-2, 185-2) and interior (ECF Nos. 165-10, 185-10) of their home are not relevant.  Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the

---

[4] ECF Nos. 199, 206.

[5] ECF Nos. 184, 202.

[6] ECF Nos. 184 (objecting to six exhibits provided in support of defendants' summary-judgment motion), 202 (objecting to the same six exhibits provided in support of defendants' response to plaintiffs' motion for partial summary judgment).

[7] *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

[8] Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment.

evidence.[9]  Defendants provide the exterior photographs to support the alleged fact that NLVPD obtained a warrant to search plaintiffs' home because of an undercover drug-buy that occurred in plaintiffs' home.[10]  The claims and defenses in this case concern the shooting and death of plaintiffs' dogs, which occurred just outside the plaintiffs' home while the officers were executing a warrant to search that home.  Though the exterior photographs don't support the fact for which defendants provide them, they do contain information that is relevant to the claims and defenses.  For example, I must consider the totality of the circumstances in determining whether the officers are entitled to qualified immunity from plaintiffs' unreasonable-seizure claim.  The general layout of the plaintiffs' property, which is depicted in the exterior photographs, is relevant to that analysis.  Plaintiffs' objection to the exterior photographs is therefore overruled.

Defendants provide the interior photographs to support the alleged fact that the NLVPD searched and photographed plaintiffs' home after the shooting.[11]  The interior photographs largely depict illicit items that the NLVPD allegedly seized from plaintiffs' home after the event that gives rise to plaintiffs' claims—the shooting death of their dogs by Maalouf and Snyder.  The photographs of those items are not relevant to the questions before me, and because my job on summary judgment isn't to weigh evidence or assess the witnesses' credibility, I do not consider those photographs in deciding the parties' summary-judgment motions.  But some of these photographs are relevant to the totality of the circumstances surrounding the shooting death of plaintiffs' dogs because they provide context for the witnesses' deposition testimony.  Thus,

---

[9] Fed. R. Evid. 401.

[10] *See, e.g.*, ECF No. 164 at 3.

[11] *See, e.g.*, *id.* at 7.

plaintiffs' objection to the interior photographs is sustained for the photographs Bates stamped NLV MSJ PHO 19–30 and overruled for the photographs Bates stamped NLV MSJ 14–18.

Plaintiffs argue that one of the reports prepared by nonparty Fernando Calderon (ECF Nos. 165-9, 185-9) lacks foundation, hasn't been authenticated, is irrelevant, and isn't a "true and correct copy" because two pages are missing. Calderon is an NLVPD investigator who interviewed Walker and Cataldo while they were detained as their home was being searched. Defendants use Calderon's report to support the facts that Walker allegedly admitted to Calderon that he used methamphetamine the night before the search, owned an unregistered handgun that he kept in the home, and that a records check showed the gun was stolen.[12] None of these alleged facts is consequential to any claim or defense in this case because what plaintiffs challenge is the seizure of their property, not the search of their home, and these alleged facts were not known to NLVPD until after the seizure occurred. Defendants argue that Calderon's report describes what happened and lays the foundation for why the police were at the plaintiffs' home in the first place. This is an overly generous characterization. In truth, all the challenged report states about those topics is that NLVPD's Narcotics Bureau executed a court-ordered narcotics search warrant at the plaintiffs' home on September 14, 2012, and "[p]rior to execution of the warrant, [Calderon] set up surveillance of the location were [he] had a visual of the front door."[13] Plaintiffs' objection that Calderon's report is not relevant is sustained, so I do not reach plaintiffs' other objections to this evidence nor do I consider this exhibit in deciding the parties' summary-judgment motions.

---

[12] *Id.*

[13] *See* ECF No. 165-9 at 4.

4

Plaintiffs object to the curriculum vitae (ECF Nos. 165-11, 185-12) and affidavit-report (ECF Nos. 165-12, 185-13) of defendants' expert W. Ken Katsaris, arguing that this evidence is inadmissible under FRE 702 because Katsaris isn't an expert on police use of force on dogs or police interactions with dogs. Defendants provide this evidence to support their argument that Maalouf and Snyder acted reasonably when they shot and killed plaintiffs' two dogs.[14] Defendants also use this evidence to support their argument that the training the City provides for NLVPD officers adequately covers their potential interactions with dogs.[15]

I do not consider the substance of this evidence for the first factual point because plaintiffs have demonstrated that the circumstances surrounding the shooting death of their dogs is genuinely disputed. As for the sufficiency of the officers' training, plaintiffs have not demonstrated that Katsaris is unqualified or that his anticipated trial testimony will be unhelpful or useless on that topic. Rather, plaintiffs' objections go to issues of weight and credibility, matters that are for the factfinder to determine and not a judge ruling on summary-judgment motions. Plaintiffs' objection to this evidence is overruled.

Finally, plaintiffs object to the "Deadly Force" section that defendants provide from the NLVPD's "Police Facility Procedure Manual," arguing that defendants failed to attach it to their appendix of exhibits. Plaintiffs don't explain why this filing error necessitates court intervention, and defendants filed an erratum correcting their mistake.[16] Plaintiffs' objection is overruled. With the evidence sorted into buckets that I can and cannot consider, I move onto the parties' motions for Rule 11 sanctions.

---

[14] *See, e.g.*, ECF No. 164 at 14–15.

[15] *See, e.g.*, *id.* at 22.

[16] ECF Nos. 194, 194-2.

**II.     The motions for sanctions are denied [ECF Nos. 199, 206].**

Plaintiffs move for sanctions under FRCP 11, arguing that defendants misrepresented in their summary-judgment motion that their version of the facts is undisputed.[17]  Defendants countermove for sanctions, arguing that plaintiffs' motion for sanctions itself violates Rule 11.[18] I deny defendants' sanctions motion because there is no evidence that they served that motion on plaintiffs 21 days before they filed it with the court.[19]  Though plaintiffs' motion is procedurally sound, I deny it, too, because the complained-about conduct doesn't violate Rule 11.

"Rule 11 is intended to deter baseless filings in district court and imposes a duty of 'reasonable inquiry' so that anything filed with the court is 'well grounded in fact, legally tenable, and not interposed for any improper purpose.'"[20]  Thus, the rule automatically imposes upon any attorney or pro se party who files a writing with the court the certification that, "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,]" the writing is not frivolous, legally unreasonable, without evidentiary foundation, or brought for an improper purpose.[21]

The crux of plaintiffs' argument is that defendants' summary-judgment motion is factually misleading—i.e., violates FRCP 11(b)(3)—because defendants misstate that their

---

[17] ECF No. 199.

[18] ECF No. 206 at 16–17.

[19] Fed. R. Civ. P. 11(c)(2) (requiring that the moving party serve the motion for sanctions on the offending party 21 days before filing it with the court); *accord Truesdell v. S. Cal. Permanente Med. Grp.*, 293 F.3d 1146, 1151 (9th Cir. 2002) (explaining that a movant satisfies Rule 11's "mandatory 21 day safe-harbor period" by serving "the allegedly offending party with a filing-ready motion as notice that it plans to seek sanctions").

[20] *Islamic Shura Council of S. Cal. v. F.B.I.*, 757 F.3d 870, 873 (9th Cir. 2014) (quoting *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 393 (1990)).

[21] Fed. R. Civ. P. 11(b)(1)–(4).

version of the facts is undisputed. But defendants don't outright ignore the fact that their version of the facts is contradicted by plaintiffs' deposition testimony. Rather, defendants provide transcripts of plaintiffs' deposition testimony as exhibits to their motion and cite *Scott v. Harris* for the proposition "that some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment" when "one of [the stories] is blatantly contradicted by the record, so that no reasonable jury could believe it . . . ."[22] Defendants also argue in reply that plaintiffs' deposition testimony does not create a genuine factual dispute because that evidence is "self[-]serving and uncorroborated."[23] The provision of plaintiffs' contradictory testimony, arguments against the sufficiency of that evidence, and the fact that plaintiffs are represented by counsel, set this case apart from the cases that plaintiffs cite in support of their bid for Rule 11 sanctions. I am not persuaded that defendants' motion is, as plaintiffs argue, factually misleading, so I deny plaintiffs' sanctions motion.

## III. Motions for summary judgment [ECF Nos. 164, 166]

### Summary-judgment standard

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[24] The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[25] If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present

---

[22] ECF No. 164 at 8–9 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[23] ECF No. 204 at 10.

[24] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[25] *Id.* at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

specific facts to show that a genuine issue exists for trial.[26]  An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party.[27]  A fact is "material" if it could affect the outcome of the case.[28]

When considering a motion for summary judgment, I view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party.[29]  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[30]  "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both  motions before ruling on each of them."[31]

### Background

Each side tells a different story about what happened when Maalouf and Snyder shot and killed plaintiffs' dogs.  Both sides provide evidence to support their version of the facts, which largely consists of deposition testimony from the parties who were present during the shooting and reports from experts that the parties retained to opine on several issues.  The parties do, however, agree about the following basic facts.

---

[26] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

[27] *Anderson*, 477 U.S. at 249.

[28] *Id.* at 248.

[29] *Id.* at 255.

[30] *Id.*

[31] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

The shooting happened at Walker and Cataldo's home early in the morning of September 14, 2012. Walker and Cataldo had two American pit bull or pit-bull mix dogs at the time of the shooting: Blue, who was a large male dog and several years old, and Pinky, who was a medium female dog and only 10 months old. Walker and Cataldo had "Beware of Dog" signs visibly posted on their property.

Plaintiffs' property consists of a trailer home with a raised front porch and stairs, small metal sheds, yard areas, two levels of fencing, and was chockablock with personal items, furniture, and debris. Approaching the property from the street, the first fence encountered is a chest-high chain-link fence that separates a gravel driveway, parking area, and yard from the public sidewalk and street. This fence has a vehicle-sized gate. After passing through the first fence and those areas, you'll encounter a second fence that runs on either side of the home and separates the home, sheds, and side- and backyards from the parts of the property that are within the first fence. The second fence has a person-sized gate near the front door of the home, is made from chain-link, and appears in the photographs provided to be waist high.[32] A layer of bamboo, about six feet tall, is attached to the front of the second fence as a privacy screen.[33]

A.    **Plaintiffs' account**

Plaintiffs testified in deposition that both of their dogs were friendly: rarely barking or growling and never aggressive to people or other animals. On the day of the shooting, plaintiffs

_____

[32] ECF No. 173 at Exhibit B (manually filed).

[33] One of the photos shows that part of the bamboo fence nearest the front door is broken in half. *See id.* (photograph labeled NLV MSJ PHO 4). Walker is adamant that this damage occurred after the shooting and after both he and Cataldo were removed from the scene. Walker suspects that the police did this damage to aid in their photographing the scene and that the officers could not see what they claim they saw while the screen was intact. ECF No. 165-5 at 13–14 (Walker). Officer Maalouf testified in deposition that the entry team of officers pulled the bamboo down— so they could see—as they were pushing the "man gate" in the second fence the rest of the way open. ECF No. 165-8 at 16 (Maalouf).

returned home around five in the morning from visiting friends in town. Walker wanted to take the dogs for a walk; Cataldo wanted to eat first.

Cataldo testified that as she was finishing her bowl of cereal, Walker let their dog Pinky out the front door. Pinky returned through the dog door by the trailer's back door and woke up their other dog Blue. Walker then got up and let both dogs out of the front door. Cataldo, who was sitting on a chair near the front door, heard Walker say something like "you don't have to do that." Confused about who Walker was speaking to, Cataldo stood, moved into the doorway, and saw two or three police officers on the property shooting their guns. After the officers stopped shooting, they ordered Cataldo and Walker to get down on their bellies and crawl to the officers. Walker crawled first and then Cataldo. Once Cataldo reached the bottom of the front porch stairs, she saw Pinky, who had been shot and appeared to be dying. She didn't see Blue. Both plaintiffs were then handcuffed and taken down the street to be interviewed.[34]

Walker's account is like Cataldo's. He testified in deposition that as Cataldo sat and ate her cereal, Pinky went out the front door and returned through the dog door in the rear of the home.[35] Blue then scratched at the front door, which Walker testified he did to be let outside. Pinky ran over and Walker let both dogs out the front door. Blue went first. Walker saw him go out the front door, down the steps, and turn right towards the sidewalk that runs along the side of the home and towards the back of the property. Walker testified that Blue always relieved himself far back on the right side of the property.

Walker watched Pinky follow Blue, and as he began closing the front door, Walker saw what looked to him like three soldiers trying to squeeze together through the gate in the second

---

[34] ECF No. 165-3 (Cataldo).

[35] ECF No. 165-5 (Walker).

fence.  One of the officers was firing a handgun straight down the sidewalk at the dogs.  Walker testified that no time elapsed between his first seeing the officers and seeing one of them shooting a gun at him dogs.  Walker said he screamed something like "Oh, my God."  After the officers stopped shooting, they told Walker to crawl down the steps on his belly, which he did.

As he crawled down the stairs, Walker saw that Pinky had not made the right turn at the steps but was shot and her legs were still moving.  According to Walker, as he was looking at Pinky, an officer kicked Walker in the head and told him "[d]on't look at that motherfucker[,]" referring to Pinky.  Like Cataldo, Walker testified that the dogs were not barking or growling and that he heard no noises until he simultaneously saw and heard the officers entering his property and shooting his dogs.  After Walker and Cataldo were handcuffed and removed from their property to the staging area, Walker heard more gun shots that sounded like they were coming from the back of his property.

Plaintiffs insist that their dogs were not barking or growling while they were outside.  They also insist that all they heard were the officers firing guns at their dogs, and when the officers finished shooting, yelling at Walker and Cataldo to crawl towards them.  According to plaintiffs, the officers didn't set off a "distraction" device, verbally announce themselves, or tell the plaintiffs to put their hands up or grab their dogs.  Neither Walker nor Cataldo witnessed any bullets impacting their dogs, but Walker and Cataldo both witnessed Pinky dying.  Walker never saw Blue again after the dog turned right after the stairs.  Cataldo retrieved the bodies of both dogs from the pound.  A friend buried the dogs; Walker was still in custody and Cataldo was not emotionally able to do so.

## B.    Defendants' account

Defendants' account of what happened begins eight days earlier when a confidential informant allegedly bought methamphetamine from Cataldo in the plaintiffs' home.[36]  This exchange prompted the NLVPD to obtain a warrant to search plaintiffs' home for drugs and related paraphernalia.  Officers Snyder and Wayne Cawthorn were responsible for preparing the initial plan for executing the warrant.[37]  Officer Fernando Calderon, who had obtained the search warrant, informed Snyder that plaintiffs kept a large dog on their property, and it was possibly a pit bull.  In surveilling the plaintiffs' property for developing a warrant-execution plan, Snyder saw that plaintiffs had posted two "Beware of Dog" signs on their property, which led him to believe that the dog might be vicious.  Snyder also noted that plaintiffs had surveillance cameras on their property.[38]

The written plan, which Snyder prepared a day before the warrant was executed, states that one "pit mix" dog was present on the property.  The only other mention of the dog in the written plan is that Officers Parrish or Maalouf "will deal with the dog if it is out front."  Though not specifically about the dog, the written plan did call for an officer to deploy a Def-Tech distraction device to the front yard, and to be prepared to deploy a second distraction device "as needed" considering that there was "a lot of debris on the property."[39]

Snyder testified in deposition that the plan changed the day that the warrant was executed and when the officers met for a pre-execution briefing at their staging area near the plaintiffs'

---

[36] ECF No. 165-1 at 4 (Crime Report).

[37] ECF No. 165-7 at 11 (Snyder).

[38] ECF No. 165-8 at 18 (Maalouf).

[39] ECF No. 165-6 at 3, 6–8 (SWAT Warrant Service Plan).  Defendants appear to use the terms "flashbang distraction device" and "Def-tech" and "Def-tech 25" to refer to the same piece of equipment, which presumably creates a bright flash and loud bang.

property.  Snyder initially planned to have officers surround the property and then call on the plaintiffs to come out.  But because more officers were available than Snyder expected, the plan changed to "more of a limited penetration or controlled entry plan," which was "all contingent upon the gates being open."[40]  Maalouf testified that the officers "typically brief right before the service so everything's fresh in everyone's mind."[41]

Snyder testified that the plan for dealing with the dog changed, too.  According to Snyder, the officers hoped that their "presence would force the dog to run away, which oftentimes happens."[42]  Officer Parrish was equipped with a PepperBall gun and, "if the dog was still at the gate, he would deliver PepperBalls to force the dog to run away, which oftentimes happens."[43]  But if that failed, the officers planned to have "Officer Maalouf shoot the dogs with his rifle . . . [a]fter [the officers] entered the property as the gate opened."[44]  Also, regardless of whether the dogs were present, the officers planned to deploy "a flashbang to the front yard area of the trailer" to serve the dual purpose of "satisfying the knock-and-announce purpose . . . [and] to force dogs to run away."[45]

Snyder, Maalouf, Parrish, and a few other officers were members of the "entry team," which was responsible for getting through the two gates on plaintiffs' property.  Maalouf similarly testified in deposition that the plan was for Parrish to deploy the flashbang distraction

---

[40] ECF No. 165-7 at 12 (Snyder).

[41] ECF No. 165-8 at 13 (Maalouf).

[42] ECF No. 165-7 at 25 (Snyder).

[43] *Id.*  Snyder testified in deposition that a PepperBall gun is like pepper spray, only instead of spray, it shoots little capsules containing pepper spray—oleoresin capsicum.  ECF No. 165-7 at 80.

[44] ECF No. 165-7 at 25 (Snyder).

[45] *Id.*

device to "try to push the dog back away from the entry team, try and scare the dog." If that didn't work, Officer Parrish was to use his PepperBall gun to "drive the dog back, take the fight out of him . . . ." Because Parrish was equipped with less-than-lethal weapons, he was positioned behind the other members of the entry team.[46]

What came to pass, according to Snyder and Maalouf,[47] is that as the entry team approached the property, Maalouf "saw what may be a pit bull run towards the backyard." Maalouf could not recall if he saw the dog before or after the flashbang device had been deployed. As the entry team made their way through the vehicle-sized gate in the first fence, "[t]he dog ran through the second gate[,] which was partially open[,] . . . and made his way to the back where [Maalouf] lost sight of him." The entry team then pulled some of the bamboo that was covering the second fence's gate near the front door down so that they could see.[48]

Maalouf explains that as the officers reached the gate in the second fence near the front door, Snyder announced "police, search warrant" and the front door opened. Maalouf saw a male and female in the home's entrance. Snyder told the couple to put their hands up. They complied. Maalouf then saw a dog behind the couple's legs "trying to push [its] way out" and said "Grab your dog." Maalouf next noticed that there were two dogs, not one, but he remembers that the couple still "didn't grab their dog[s]. They kept their hands up. And then it's like the gentleman just kind of moved to the side and let the dog out." Maalouf testified that the dogs then "came running right towards [the officers, particularly Maalouf,] aggressively

---

[46] ECF No. 165-8 at 13–14, 17 (Maalouf).

[47] Officer Parrish testified in deposition that he doesn't remember the incident. ECF No. 189-4 at 8 (Parrish). Officer Jason Scarale, who was also present during this warrant execution, testified in deposition that he, too, doesn't recall much about the incident. ECF No. 189-5 at 12–13 (Scarale).

[48] ECF No. 165-8 at 15–16 (Maalouf).

barking." Maalouf explains that the officers were within 6–8 feet of each other, near the second fence's gate, and approximately 10–15 feet away from the front door.[49]

Maalouf recalls that the dogs were staggered with the smaller one in the lead. The first dog ran down the stairs, and when it was about 8 to 10 feet away, Maalouf started shooting it with his MP5, a fully automatic, silenced submachine gun, because he "knew that the dog was going to bite [him] or somebody else on the team." Maalouf says he knew this because the dog "was not coming with his tail wagging like he was going to lick" the officers, but like "you're trespassing on my property" and "I'm going to protect my homeowner." Maalouf could not recall if the dog was growling. Maalouf shot one burst of bullets at the first dog, and when it kept moving, Maalouf shot a second burst at it. As Maalouf shot the second burst of bullets at the first dog, it "turned sideways slightly," and Maalouf then turned his attention to the second dog, which had come out of the home and was proceeding in the same manner as the first dog. Maalouf shot the second dog with two bursts of bullets and, like the first dog, it turned to the side. But unlike the first dog, the second dog took off running towards the back of the property where Maalouf believes it succumbed to its injuries.[50]

Maalouf explains that, initially, "the dogs were far enough away that [he] was comfortable," but when the dogs "didn't turn to run around the side" of the home—"they came straight towards" the officers—he shot the dogs when they were "about the step area" because he "wasn't going to be able to let them get any closer." Two indicators led Maalouf to believe that the dogs were going to bite him or another officer: (1) the dogs were forcing their way out the door and (2) the dogs ran aggressively towards Maalouf, "barking as if they were going to

---

[49] *Id.* at 19–20.

[50] *Id.* at 21–23, 26.

bite . . . ." These were the first dogs Maalouf had shot in his career; he joined NLVPD's SWAT team in May 2001. Maalouf recalls that Snyder shot one of the dogs, too, but could not recall which one. Maalouf and Snyder are the only officers who discharged their weapons. After the officers stopped shooting, one of them instructed the plaintiffs to come to the officers; the plaintiffs complied and were placed in custody.[51]

The only other officer who recalled in deposition what happened is Snyder, who testified that when the entry team arrived at plaintiffs' property—but before Snyder had opened the first fence's gate—Maalouf informed the other officers over the radio that he saw the dog out front and that it ran away from the officers and towards the back of the property.[52] Snyder then opened the first fence's gate, which wasn't locked, and the team proceeded onto plaintiffs' property and towards the gate in the second fence. Snyder recalls that the gate in the second fence was open and that Parrish deployed the flashbang device into the front yard after the dog ran away.[53] Sergeant Waller walked through the second fence's gate first, followed by the rest of the entry team.[54] After deploying the flashbang device into the front yard, Parrish—the only officer for whom the plan called to use non-lethal devices to subdue the dogs—"pushed towards the rear" of the property and did not accompany the entry team to the front door.[55]

At this point, Snyder saw the front door open and a man was standing in the doorway with a medium-sized pit bull behind his legs. Snyder, who was 15–20 feet away, couldn't tell if

---

[51] Id. at 6, 23, 38, 42–43.

[52] ECF No. 165-7 at 28 (Snyder).

[53] Snyder testified that a second flashbang device had been deployed, possibly by Officer Booker, but he could not recall when that happened. ECF No. 165-7 at 52.

[54] Id. at 28–29.

[55] Id. at 29–30.

the dog was vicious. Snyder stated "police" and the man slammed the door. As the officers moved towards the front door, it opened again and this time the man was joined by a woman and two dogs were between or behind the couple's legs. The man's hands were partially concealed behind the edge of the door, so Snyder instructed, "show me your hands." The man and woman complied. Maalouf then told the couple to "grab your dogs." They didn't comply. Instead, the man took "a slight step and both dogs c[a]me charging out from behind him." The smaller dog was first, followed by the larger dog. As the dogs ran along the porch and down the stairs, Maalouf fired on the first dog and Snyder did, too. Snyder explains that Officer Rockwell was present with a less lethal TASER weapon, but he was behind Maalouf and Snyder because the area was not cleared, and the suspects were at the front door.[56]

Snyder and Maalouf both shot at the first dog. Snyder didn't shoot at the second dog but continued to focus on the first while Maalouf turned his attention to the second dog. The first dog "went down . . . at the bottom of the stairs and to [Snyder's] left." Snyder recalls that the second dog went down but got up and ran away towards the back of the property. The officers then instructed the man and woman, who had dropped down in the doorway during the shooting, to crawl down the stairs to the officers. The couple complied and were taken into custody by other officers. Snyder says that he then tried to move deeper onto the property, but he saw the first dog move and try to get up, so he fired two more bullets into it "to, basically, end its suffering and also to make sure that [he] doesn't have to concentrate on that dog in conjunction with the area behind [him] and to [his] left."[57] From these disparate versions of what happened, both sides move for summary judgment on some or all of plaintiffs' claims.

---

[56] *Id.* at 29–31.

[57] *Id.* at 34–35.

17

**Discussion**

**A.  Genuine issues of material fact preclude summary judgment on the unreasonable-seizure claim and qualified-immunity defense.**

Plaintiffs allege that Officers Maalouf and Snyder violated their Fourth Amendment right to be free from unreasonable seizures of their property when the officers shot and killed their dogs.  Maalouf and Snyder raise the affirmative defense of qualified immunity to this unreasonable-seizure claim.  Both sides move for summary judgment on both the claim and the defense.  I first address whether Maalouf or Snyder enjoy qualified immunity from the unreasonable-seizure claim.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[58] When deciding if a government official is entitled to qualified immunity, courts ask whether (1) the facts that the plaintiff has alleged or shown "make out a violation of a constitutional right" and (2) "the right at issue was 'clearly established' at the time of the defendant's alleged misconduct."[59]  Plaintiffs bear the burden of demonstrating that both prongs are met.[60]  Courts "have discretion to choose which qualified-immunity prong to address first" and, depending on the conclusion reached for the first-analyzed prong, "need not address the other."[61]  "But under

---

[58] *White v. Pauly*, ___ U.S. ___, ____, 137 S. Ct. 548, 551 (2017) (quotation omitted).

[59] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

[60] *Isayeva v. Sacramento Sheriff's Dept.*, 872 F.3d 938, 946 (9th Cir. 2017).

[61] *Id.* (citing *Pearson*, 555 U.S. at 236 (departing from the mandate in *Saucier v. Katz*, 533 U.S. 194, 207 (2001), that the first question must be resolved first)).

either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."[62] I address these prongs in reverse order.

### 1. *Plaintiffs have shown a clearly established right.*

"Public officials are immune from suit under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."[63] The right may not be characterized "at a high level of generality."[64] Instead, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established."[65] "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory conduct or constitutional question beyond debate."[66]

Plaintiffs characterize their clearly established right as the right to not have their dogs shot and killed by law-enforcement officers absent exigent circumstances.[67] Plaintiffs argue that this right's contours were sufficiently defined by the Ninth Circuit in *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, which concerns the shooting death of three pet dogs by police officers while they were executing warrants to search two properties for evidence

---

[62] *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

[63] *City & County of San Francisco v. Sheehan*, ___ U.S. ___, ___, 135 S. Ct. 1765, 1774 (2015) (quotation omitted).

[64] *Mullenix v. Luna*, ___ U.S. ___, ___, 136 S. Ct. 305, 308 (2015) (quotation omitted).

[65] *Id.* (quotation omitted).

[66] *Sheehan*, 135 S. Ct. at 1774 (quotation omitted).

[67] *See, e.g.*, ECF No. 166 at 20–21.

showing an indicia of Hells Angels affiliation.[68]  The plaintiffs there claimed that the officers'

conduct amounted to unreasonable seizures in violation the Fourth Amendment, and the officers

moved for summary judgment on their qualified-immunity defense to the unreasonable-seizure

claim.  The district court denied the officers' motion and the Ninth Circuit affirmed, explaining

that the officers "were given a week to plan the entry[,]" but aside from their "interest in

preserving evidence, the officers were not presented with exigent circumstances that necessitated

killing the dogs."[69]  Thus, the Ninth Circuit concluded, "the failure to develop any realistic non-

lethal plan for dealing with the dogs is simply not the type of reasonable mistake in judgment to

which a court should give deference in determining whether the officers are entitled to qualified

immunity."[70]

The Ninth Circuit decided *City of San Jose* in 2005, so, based on plaintiffs' account,

when defendants executed the search warrant in 2012, they had fair notice that plaintiffs had the

right to be free from officers killing their dogs absent exigent circumstances.  And because the

officers knew in advance that plaintiffs had a dog on their property, this right required the

officers to develop a realistic non-lethal plan for dealing with the dog.

> **2.      Whether the officers violated plaintiffs' right turns on
> material issues of fact that are genuinely disputed.**

"The killing of a dog is a destruction that is recognized as a seizure under the Fourth

Amendment and can constitute a cognizable claim under § 1983."[71]  To determine whether the

---

[68] *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962 (9th Cir. 2005).

[69] *Id.* at 978.

[70] *Id.*

[71] *Id.* at 975 (quotation and brackets omitted).

shooting death of plaintiffs' dogs was "reasonably necessary to effectuate the performance of the" officers' duties, I look to the "totality of the circumstances" and "balance the nature of quality of the intrusion" on plaintiffs' "Fourth Amendment interests against the countervailing governmental interests at stake."[72]

Applying these standards here, the nature and quality of the intrusion was complete destruction: Maalouf and Snyder shot and killed plaintiffs' two dogs. Defendants identify the safety of the officers and the need to prevent the destruction of evidence as the governmental interests that justify this intrusion. In determining how the intrusion balances against the government's interests, I must view the evidence "in the light most favorable to the party asserting the injury . . . ."[73] Defendants don't dispute that this is the standard, but they argue that plaintiffs' evidence is not enough to create genuine factual disputes about what happened.

Defendants cite *Scott v. Harris* for the proposition that I should disregard plaintiffs' version of the facts. But defendants don't analyze why the holding in *Scott* applies in this case. *Scott* concerns a § 1983 action that a motorist brought against a county deputy in Georgia, alleging that the deputy used excessive force during a high-speed chase. The district court denied the deputy's motion for summary judgment on the question of qualified immunity and the Eleventh Circuit affirmed. The Supreme Court reversed, explaining that despite being the nonmovant, the motorist's version of the facts did not have to be believed at summary judgment because there existed in the record "a videotape capturing the events in question" that told "quite a different story" from what the motorist said happened.[74] But *Scott* doesn't support defendants'

---

[72] *Id.* (quotation omitted).

[73] *Saucier*, 533 U.S. at 201.

[74] *Scott*, 550 U.S. at 378–80.

argument because there is no video or other such evidence in the record of this case that "so utterly discredit[s]" plaintiffs' version of the facts that no reasonable jury could believe them.[75]

Defendants also argue that I should disregard plaintiffs' deposition testimony because it is self-serving and uncorroborated, but defendants don't provide any authority to support this argument. The Ninth Circuit has instructed that district courts may not disregard an item of evidence at summary judgment based solely on the "self-serving nature" of that evidence.[76] District courts may, however, disregard self-serving evidence that "states only conclusions and not facts that would be admissible evidence."[77] Though self-serving, Walker's and Cataldo's deposition testimony is based on their personal knowledge, factually detailed, legally relevant, and internally consistent. Plaintiffs' deposition accounts are therefore enough to establish a genuine dispute of material fact about whether Maalouf and Snyder acted reasonably when they shot and killed plaintiffs' dogs. Considering these authorities, I decline defendants' invitation to ignore plaintiffs' version of events in determining whether the officers violated plaintiffs' rights.

Viewing the evidence in the light most favorable to Walker and Cataldo, there are genuine issues of material fact about whether Maalouf and Snyder acted reasonably. The factual disputes center on whether (1) a reasonable officer would have concluded that plaintiffs' dogs posed an immediate threat to the officers and (2) the officers developed a realistic non-lethal plan for dealing with plaintiffs' dogs.

---

[75] Snyder and Maalouf both testified in deposition that they listened to an audio recording of the warrant service before they were deposed, but it's not clear what audio was recorded—the warrant service itself or merely NLVPD's radio traffic of that event—and no party provides it in support of its summary-judgment arguments. ECF Nos. 165-7 at 5 (Snyder), 165-8 at 5 (Maalouf).

[76] *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

[77] *Id.*

Plaintiffs testified that their dogs were not aggressive and that they did not observe or hear their dogs barking or growling at the time of the incident. Walker testified that he saw Blue go down the front porch stairs and turn right to go to the backyard along the side of the home. Walker saw Pinky go down the stairs and turn right, too. Then, as he was closing the front door, Walker saw three officers come through the second fence's gate near the front door. According to Walker, the first officer was firing a handgun down the side of the home and at the dogs. Plaintiffs testified that they didn't hear the officers announce themselves, as the officers claim, by deploying a flashbang device into the front yard or shouting "police," "search warrant," "show me your hands," and "grab your dogs." Plaintiffs' testimony raises the reasonable inference that the dogs were running from the officers—whether fleeing from or oblivious to the officers' presence—and not acting aggressively. It also raises the reasonable inference that the officers failed to develop a realistic non-lethal plan for dealing with the dogs.

Viewed in a light most favorable to plaintiffs, the evidence shows that the officers planned for some of them to be equipped with non-lethal devices but didn't have a realistic plan for how they could those devices to subdue plaintiffs' dogs. The evidence also shows that the officers entered the second fence's gate near the front door just as Walker let the dogs out the front door, the dogs were ignorant or scared of the officers, and Maalouf and Snyder shot the dogs when they were moving away from the officers and towards the back of the property. A reasonable officer in the circumstances that plaintiffs describe would not have concluded that plaintiffs' dogs posed an immediate threat to anyone and would not have fatally shot them.

But plaintiffs' account of what happened is genuinely disputed. Defendants contend that the officers planned to use non-lethal devices to cause the dogs to run away from the entry team. Parrish was to deploy a flashbang distraction device into the plaintiffs' front yard. The officers

testified that, oftentimes, deploying this device caused dogs to run away. If the dog didn't flee from the flashbang device, Parrish was going to shoot the dog with his PepperBall gun, causing it pain and discomfort and encouraging it to run away from the entry team. But if that failed, Maalouf and Snyder were equipped and prepared to shoot the dog with lethal weapons. The officers testified that Parrish did deploy a flashbang device into the plaintiffs' front yard and Maalouf told plaintiffs to grab their dogs, which were both in the home behind plaintiffs' legs. But plaintiffs didn't grab their dogs. Instead, Walker moved aside and allowed the dogs to run out of the door. The dogs didn't run towards the back of the property but directly at the officers and in aggressive manner, i.e., barking. Concerned that the dogs would bite them or the other officers, Maalouf and Snyder shot and killed the dogs.

Because my job at summary judgment isn't to weigh the evidence or assess the witnesses' credibility, these genuine disputes prevent me from concluding as a matter of law whether Maalouf's or Snyder's conduct violated the Constitution. As the Ninth Circuit explained in *Ortega v. O'Connor*, when qualified immunity "depends on genuinely disputed issues of material fact, the court must submit the fact-related issues to the jury[,]" and summary judgment is not available.[78] The same is true for the merits of plaintiffs' unreasonable-seizure claim. Because material factual disputes prevent me from concluding what the plaintiffs, their dogs, and the officers did, I'm prevented from determining as a matter of law whether Maalouf and Snyder's conduct was reasonably necessary to effectuate the performance of their duties as law enforcement officers. Thus, I deny the cross-motions on plaintiffs' unreasonable-seizure claim and the officers' qualified-immunity defense to that claim.

---

[78] *Ortega v. O'Connor*, 146 F.3d 1149, 1154 (9th Cir. 1998).

**B.      Plaintiffs' *Monell* claim against the City falters at deliberate indifference.**

With their second claim for relief, plaintiffs seek to hold the City of North Las Vegas liable for the shooting death of their dogs under *Monell v. Department of Social Services*, which extends § 1983 liability to a municipal employer only if the constitutional violation was the result of its policy, practice, or custom or a decision-making official directed or ratified the complained-of conduct.[79]  The policy that plaintiffs complain about is a failure to train and supervise,[80] so plaintiffs must show that (1) they were "deprived of a constitutional right," (2) the City's training and supervision policy "amounts to deliberate indifference to the constitutional rights of the persons with whom its police officers are likely to come into contact" with, and (3) plaintiffs' "constitutional injury would have been avoided had the City properly trained [and supervised] those officers."[81]  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."[82]  Plaintiffs can establish deliberate indifference by demonstrating that either "[a] pattern of similar constitutional violations by untrained employees" exists or "the unconstitutional consequences of failing to train" are "so patently obvious that a city could be liable . . . without proof of a pre-existing pattern of violations."[83]  The latter showing, called "single-incident liability," is "rare" and occurs only "in a narrow range of circumstances."[84]

---

[79] *Hopper v. City of Pasco*, 241 F.3d 1067, 1082–83 (9th Cir. 2001) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690–94 (1971)).

[80] *See, e.g.*, ECF No. 187 at 37.

[81] *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (quotation and brackets omitted).

[82] *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quotation omitted).

[83] *Id.* at 62–64 (quotation omitted).

[84] *Id.* at 63–64.

Among other things, the City argues that plaintiffs cannot prevail on their *Monell* claim because, though plaintiffs "briefly describe" in their operative pleading "four other instances in which force was used on dogs[,]" they don't have evidence to show "that the described incidents involve unconstitutional behavior and none of them has resulted in a finding of unconstitutional behavior."[85] Plaintiffs counter that the evidence shows a pattern of similar violations, and single-incident liability exists, too.[86]

Plaintiffs' evidence of similar violations consists of comparing NLVPD's records of officer-involved shootings of dogs in 2011 and 2012 with the Las Vegas Metropolitan Police Department's (LVMPD) statistical report of the same kind of shootings for the same years.[87] Plaintiffs argue that those records show that in the same two-year span, NLVPD officers shot and killed far more dogs than LVMPD officers did: NLVPD shot 27 dogs and killed 21 of them; LVMPD shot 17 dogs and killed 4 of them.[88] But plaintiffs don't provide any evidence to show what LVMPD's training program consisted of then (or now), and LVMPD's statistical report doesn't contain any factual details about the shootings.

Plaintiffs also don't provide an analysis or summary of NLVPD's records—which exceed 100 pages—they just cite to it generally.[89] Plaintiffs appear to assume that these records clearly show constitutional violations like what they allege occurred here, but that conclusion isn't

---

[85] ECF No. 164 at 22.

[86] ECF No. 187 at 38–41.

[87] *Id.* at 22 (*comparing* ECF Nos. 190-5, 190-6 (NLVPD's records), *with* ECF No. 191-1 (Deadly Force Statistical Analysis 2008–2012 prepared by the Las Vegas Metropolitan Police Department's Office of Internal Oversight and Critical Incident Review Team and dated Sept. 16, 2013)).

[88] *Id.* (Pinky and Blue are included in the 21 dogs that were shot and killed by NLVPD officers).

[89] *See, e.g.*, ECF No. 187 at 39.

obvious from the face of the records. For example, one of the reports involves NLVPD officers responding to a call about a dog that attacked a woman and her pet dog while they were walking in the early morning of September 2011. The officers who responded encountered two dogs, not one, and followed those dogs to the side of a residence. One of the dogs, a pit bull, was foaming at the mouth. The officers requested animal control to respond but animal control was not yet on duty. The officers stayed, watching the dogs and waiting for animal control, but then an air conditioner kicked on, which startled the dogs and caused the pit bull to charge at the officers. The officers each shot the pit bull, which died from its wounds. The report states that the officers didn't know who, if anyone, owned the pit bull.[90]

The event reported in this record isn't similar to the alleged violation here: pet dogs shot and killed during execution of a search warrant where the officers knew that at least one dog would be present but failed to create a realistic non-lethal plan for dealing with it and then shot the dogs when they didn't pose an immediate threat to anyone. I decline plaintiffs' implied offer that I cull the rest of these records for any events that are arguably similar.[91] Plaintiffs have fallen short of demonstrating that a pattern of violations similar to the ones that they allege occurred here exists such that NLVPD was on notice that its training was inadequate with respect to officers' interactions with pet dogs encountered during warrant executions.

Plaintiffs also argue that this case falls within the "narrow range of circumstances" where a pattern of similar violations is not necessary to show deliberate indifference. The single-incident theory of municipal liability applies when the facts show an obvious need for specific

---

[90] ECF No. 190-6 at 6–8.

[91] *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 627 F.3d 376 (9th Cir. 2010) ("It behooves litigants, particularly in a case with a record of this magnitude, to resist the temptation to treat judges as if they were pigs sniffing for truffles.").

legal training.  In *City of Canton v. Harris*, the "[Supreme] Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force."[92]  The Court explained that the need to train officers about the constitutional limits on the use of deadly force in those circumstances "can be said to be 'so obvious' that the failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."[93]  Single-incident liability thus depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."[94]

Plaintiffs argue that, like attempting to arrest fleeing felons, it is a "moral certainty" that NLVPD officers will, at some point, encounter dogs while executing search warrants.[95]  This common-sense statement is supported by the deposition testimony of two NLVPD officers who estimate that a dog has been present during at least half of all warrant executions that they've participated in.[96]  Plaintiffs have thus demonstrated that this situation is very likely to recur.

Even so, defendants reply, there isn't an obvious need for a specific training here because, unlike in the Supreme Court's hypothetical, which dealt with police-academy applicants, this case concerns officers who "were highly trained SWAT team members" and "involved in the execution of hundreds of warrant services."[97]  In defendants' view, NLVPD's

---

[92] *Connick v. Thompson*, 563 U.S. 51, 63 (2011) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989)).

[93] *Canton*, 489 U.S. at 390 n.10.

[94] *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S 397, 409 (1997).

[95] ECF No. 187 at 40.

[96] ECF Nos. 189-4 at 15 (Parrish), 189-5 at 11 (Scarale).

[97] ECF No. 204 at 18.

training equips its officers with the specific tools that they need to avoid violating citizens' rights when they encounter a pet dog while executing search warrants.[98]  Defendants' expert describes this as "'threat assessment' training[,]" which he says "prepares an officer for any and all potential attacks, or circumstances that may appear as an attack."[99]  Plaintiffs' expert disagrees, explaining that while the officers do receive "extensive training in the use of deadly force[,]" they are not trained on how to use "non-deadly force contact with domestic pets" and that this "omission[,]" combined with Maalouf's and Snyder's "testimony that they believed they were allowed under [NLVPD's use-of-force] policy to use deadly force whenever confronting a pet dog, shows a deficit in training and an established culture whereby the use of deadly force was not only tolerated, but encouraged."[100]  The training that plaintiffs envision NLVPD should provide its officers is how to "plan for and to use less intrusive means of subduing dogs they know in advance to be present at a warrant service."[101]  So, it is genuinely disputed whether NLVPD's training equips its officers with the tools that they need to avoid violating citizens' constitutional rights.  I'll return to this dispute in a moment.

To answer the question of predictability—whether it's obvious that an officer who lacks the specific training that plaintiffs envision would violate a citizen's rights—I am guided by the Supreme Court's decisions in *Canton*, which I've already discussed, and *Connick v. Thompson*. *Connick* arises out of a lawsuit brought by former state prisoner Thompson who was wrongfully convicted of attempted armed robbery and spent 18 years in prison for that crime.  Thompson was eventually exonerated based on blood-test evidence that the prosecutor had failed to

---

[98] ECF No. 165-12 at 7 (Katsaris).

[99] *Id.*

[100] ECF No. 188-1 at 13 (Crosby).

[101] ECF No. 187 at 37.

disclose.  Trying to hold the Orleans Parish District Attorney's Office liable based on a failure-to-train theory, Thompson argued that a pattern of similar *Brady v. Maryland*-[102] violations existed, and his situation fell within the narrow range of circumstances that the *Canton* court left open for single-incident liability.  The Court rejected both arguments.

On the question of single-incident liability, the Court distinguished its facts from those in the *Canton* hypothetical, explaining that the latter "assumes that the armed police officers have no knowledge at all of the constitutional limits on the use of deadly force."[103]  The Court rationalized that attorneys, however, are not so untrained.  "Attorneys are trained in the law and equipped wit the tools to interpret and apply legal principles, understand constitutional limits, and exercise judgment."[104]  Their professional training doesn't end at graduation because, in most jurisdictions, attorneys must "satisfy continuing-education requirements."[105]  And "[a]ttorneys who practice with other attorneys, such as in district attorney's offices, also train on the job as they learn from more experienced attorneys."[106]

Though neither case is a perfect fit, our circumstances fall closer to the attorneys in *Connick*.  This is so because it is undisputed that NLVPD officers were familiar with general use-of-force and permissible-seizure standards.  So, like in *Connick*, plaintiffs do not—because they cannot—"rely on the utter lack of an ability to cope with constitutional situations that underlies the *Canton* hypothetical, but rather must assert that" the officers "were not trained

---

[102] *Brady v. Maryland*, 373 U.S. 83 (1963).

[103] *Connick*, 563 U.S. at 67.

[104] *Id.* at 64.

[105] *Id.* at 65.

[106] *Id.*

about . . . the specific scenario related to the violation in [this] case."[107]  Recall that the dispute is whether the training that NLVPD officers receive is enough to cover this scenario.  But it is precisely "[t]hat sort of nuance" that the Supreme Court explained in *Connick* "cannot support an inference of deliberate indifference here."[108]  Because "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate incident."[109]  Because plaintiffs have shown "merely that additional training would have been helpful in making difficult decisions[,]" they have not demonstrated that the "single-incident liability that the Court left open in *Canton*" applies in this case.[110]  I therefore grant defendants' summary-judgment motion on plaintiffs' claim against the City for *Monell* liability.

### C.     Plaintiffs' state-law claims are a mixed bag.

Defendants raise several reasons why they are entitled to summary judgment on plaintiffs' state-law claims for negligent training and supervision and intentional and negligent infliction of emotional distress.[111]  I address each argument in turn.

### 1.     The officers have not demonstrated that they are statutorily immune.

Snyder and Maalouf first argue that they are statutorily immune from plaintiffs' state-law claims under NRS 41.032, which grants NLVPD and its employees immunity from state-law claims based on the "failure to exercise or perform a discretionary function . . . whether or not

---

[107] *Id.* at 67.

[108] *Id.*

[109] *Id.* (quoting *Canton*, 49 U.S. at 392).

[110] *Id.* at 68.

[111] ECF No. 164 at 23–28.

the discretion involved is abused."[112]  The Nevada Supreme Court has adopted the federal *Berkovitz-Gaubert*[113] test to determine whether a state official's actions are protected by discretionary immunity.[114]  To qualify, the action must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy.[115]  Though defendants correctly state that this is the standard, their analysis of how it applies in this case is fatally conclusory, stating merely that "[i]n the instant case, the immunities described at Nevada Revised Statute 41.032 apply to provide discretionary immunity for the state law claims brought against Snyder and Maalouf.  Their split[-]second decision to use force against [p]laintiffs' dogs is precisely the types [sic] of conduct contemplated by the statute."[116]  With their analysis clocking in at well under 50 words, Snyder and Maalouf have not demonstrated that they are statutorily immune from plaintiffs' state-law claims, so their motion for summary judgment on that ground is denied.[117]

### 2.    *Plaintiffs' common-law claims are not preempted by NRS 41.740.*

Defendants next argue that plaintiffs' state-law claims all fail because they are preempted by NRS 41.740.  This statute provides that "if a natural person intentionally, willfully, recklessly

---

[112] Nev. Rev. Stat. § 41.032(2).

[113] *Berkovitz v. United States*, 486 U.S. 531 (1988); *United States v. Gaubert*, 499 U.S. 315 (1991).

[114] *Martinez v. Maruszczak*, 168 P.3d 720, 728–29 (Nev. 2007).

[115] *Id.* at 729.

[116] ECF No. 164 at 24.

[117] Another obstacle to summary judgment on this defense is the fact that the question of what happened—i.e., whether the officers' actions violated the Constitution—is genuinely disputed. *See Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) ("In general, governmental conduct cannot be discretionary if it violates a legal mandate.").  The statute also does not shield the City or its employees from intentional torts or bad-faith conduct.  *Falline v. GNLV Corp.*, 823 P.2d 888 (Nev. 1991).

or negligently injures or kills the pet of another natural person, the person is liable for" certain enumerated economic damages not to exceed $5,000 per pet and reasonable attorney's fees and costs of suit.[118]  The statute expressly proscribes awards of punitive and noneconomic damages in actions brought under the statute.[119]  And it prohibits damage awards in certain circumstances, including when the person "reasonably believed that" the pet posed a risk to a person's safety and action was necessary to protect that person.[120]

Defendants explain that "[i]t is well established that the Nevada legislature may preempt common law so long as the preemption is clear from the statute."[121]  But they don't bother to explain or analyze why each of plaintiffs' claims is preempted by this statute.  Plaintiffs respond that this statute doesn't displace their common-law claims but merely provides a method for pet owners to recover economic damages when their pet is injured or killed by the act of another person.[122]  The proof, plaintiffs say, is that the statute repeats the phrase "in an action brought under this section."  The legislature used that phrase to explain when punitive and noneconomic damages cannot be awarded and when damages are capped.[123]  It also used similar language to explain when an owner can recover reasonable attorney's fees and costs.

After reviewing NRS 41.740, I conclude that it does not clearly and unambiguously set forth the sole means by which a natural person can be held civilly liable for injuring or killing another person's pet.  By using the limiting phrase "in an action brought under this section," the

---

[118] Nev. Rev. Stat. § 41.740(1), (3).

[119] *Id.* at § 41.740(2)

[120] *Id.* at § 41.740(4).

[121] ECF No. 164 at 24 (citing *Sheriff, Washoe Cty. v. Marcus*, 995 P.2d 1016 (Nev. 2000)).

[122] ECF No. 187 at 43–44.

[123] Nev. Rev. Stat. § 41.740(2), (3).

Nevada Legislature tipped its hand that it was not preempting all common-law tort claims that a pet owner could bring when it enacted NRS 41.740. Accordingly, defendants' summary-judgment motion is denied on this ground.

### 3. *Plaintiffs' NIED claim fails for lack of a family membership.*

In their fifth claim for relief, plaintiffs allege that defendants are liable for negligent infliction of emotional distress (NIED). To recover for NIED under Nevada law, plaintiffs must demonstrate that they were (1) "located near the scene[,]" (2) "emotionally injured by the contemporaneous sensory observance of the accident[,]" and (3) "closely related to the victim."[124] Defendants argue that plaintiffs' claim fails because Nevada law defines "closely related" to mean family membership, either by blood or marriage, which implicitly excludes the owner-pet relationship in this case.[125] I agree.

The Nevada Supreme Court announced in *Grotts v. Zahner* that the third factor of an NIED claim "concerning closeness of [the] relationship between a victim and bystander should, as a general proposition, be determined based upon family membership, either by blood or marriage."[126] The court held that "any non-family 'relationship' fails, as a matter of law, to qualify for NIED standing."[127] Applying that holding to the facts before it, the Court concluded that the bystander-plaintiff did not have standing to lodge an NIED claim, though she was the victim's fiancée, "[b]ecause she was not a member of his 'family' by blood or marriage" and, thus, "does not enjoy the type of 'close relationship' required" under Nevada law.[128] The

---

[124] *Grotts v. Zahner*, 989 P.2d 415, 416 (Nev. 1999).

[125] ECF No. 164 at 26–27.

[126] *Grotts*, 989 P.2d at 416 (quotation omitted).

[127] *Id.*

[128] *Id.*

1   argument for a family relationship by blood or marriage is a nonstarter here, so defendants'

2   motion for summary judgment on plaintiffs' NIED claim is granted.

3              **4.      *Plaintiffs can proceed on their IIED claim.***

4         Plaintiffs allege in their fourth claim for relief that defendants are liable for intentional

5   infliction of emotional distress (IIED).  To prevail on this claim under Nevada law, plaintiffs

6   must show that (1) defendants engaged in "extreme and outrageous conduct with either the

7   intention of, or reckless disregard for, causing emotional distress," (2) plaintiffs "suffered severe

8   or extreme emotional distress," and (3) "actual or proximate causation."[129]  "[E]xtreme and

9   outrageous conduct is that which is outside all possible bounds of decency and is regarded as

10  utterly intolerable in a civilized community."[130]

11        Defendants argue that the officers are entitled to summary judgment in their favor on this

12  claim because, "[b]ased on the totality of circumstances, the conduct at issue does not qualify as

13  extreme and outrageous because the officers did not engage in any 'extreme abuse' of their

14  authority."[131]  Snyder and Maalouf contend that they were protecting themselves and their fellow

15  officers from plaintiffs' aggressive dogs.  But what happened is genuinely disputed, so the

16  officers must demonstrate that they are entitled to judgment when the evidence is viewed in a

17  light most favorable to the plaintiffs.  They have not met this burden.

18        A reasonable jury could conclude that Snyder and Maalouf fatally shooting plaintiffs'

19  dogs when they were not aggressive and were running away—so, did not pose an immediate

20  threat to the officers—constituted an extreme abuse of the officers' authority.  A reasonable jury

21

22  ───────────────
    [129] *Star v. Rabello*, 625 P.2d 90, 91–92 (Nev. 1981).

23  [130] *Maduike v. Agency Rent-A-Car*, 953 P.2d at 24, 26 (Nev. 1998) (quotation omitted).

    [131] ECF No. 164 at 26.

could likewise conclude that kicking Walker in the head, calling his dying dog a "motherfucker" to his face, and telling him not to look at his dying dog was an extreme abuse of authority. Thus, defendants' motion for summary judgment on plaintiffs' IIED claim is denied.

### 5. The City is statutorily immune from plaintiffs' Nevada-law claim for negligent training, supervision, and retention.

Plaintiffs allege with their third claim for relief that the City is liable in negligence for NLVPD's decisions to (1) permit "its officers to shoot dogs during the execution of a [sic] search warrants in the past" and (2) "not revis[e] the policy regarding officers and shooting pet dogs during the execution of search warrants."[132] The City argues that this claim fails for the same reasons as plaintiffs' *Monell* claim, but they offer no authority or analysis to back up that conclusion.[133] Slightly less conclusory, the City also argues that it is statutorily immune from this claim because the Ninth Circuit has "held that 'decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield.'"[134] But why that general proposition applies on these facts is anyone's guess, according to the City's motion.

For guidance in determining whether the City is statutorily immune from this claim, I look to the Nevada Supreme Court's decision in *Clark County School District v. Payo*.[135] That case addressed whether the Clark County School District (CCSD) was liable to a student who sustained a serious eye injury while playing floor hockey during P.E. class. The Court concluded

---

[132] ECF No. 88 at ¶ 55.

[133] ECF No. 164 at 24.

[134] *Id.* (quoting *Neal-Lomax v. Las Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1170 (D. Nev. 2008)).

[135] *Clark County School District v. Payo*, 403 P.3d 1270 (Nev. 2017) (en banc).

that discretionary-function immunity applied to CCSD's "decisions to add floor hockey as a unit of the physical education curriculum and to not provide safety equipment[,]" explaining that those decisions meet both parts of the *Berkovitz-Gaubert* discretionary-function test because they constitute "discretionary policy decisions [that] are made at a broad level" and "impact how" teachers and coaches can do their jobs as state employees.[136] The Court differentiated those decisions from "the discretionary decisions based on each employee's choice and judgment"— i.e., decisions that the coach "made in supervising his P.E. class, such as the choices regarding team size and game instruction[,]" which the Court explained "are not policy-based decisions that are entitled to discretionary immunity.[137]

Plaintiffs complain that NLVPD has decided to not wholesale proscribe the fatal shooting of dogs that officers encounter while executing search warrants and to not revise the existing policies that apply in circumstances like these. These decisions involve "the exercise of a high degree of official judgment or discretion[,]" "entail policy formation," and involve "the evaluation of economic, social, and [possibly even] political considerations."[138] NLVPD's decisions are therefore like CCSD's decisions to add a floor hockey unit to P.E. classes and not provide safety equipment; they are not like the coach's decisions about team size and game instruction. Thus, the City is statutorily immune from plaintiffs' third claim for relief alleging negligent training, supervision, and retention under Nevada law.

---

[136] *Id.* at 1277–78.

[137] *Id.* at 1278.

[138] *See id.* at 1277.

### D. Plaintiffs can seek punitive damages against the officers but not the City.

Finally, defendants move for summary judgment on plaintiffs' demand for punitive damages, arguing that the standard for such awards is high and there is no evidence that defendants' conduct was either "driven by evil motive or intent" or "involved a reckless or callous indifference to [p]laintiffs' rights."[139]  Plaintiffs respond that the question of whether the standard has been met should be left to the factfinder because what happened is genuinely disputed and plaintiffs' account reflects that the officers acted with reckless or callous indifference to their rights.[140]  Plaintiffs concede in a footnote that that they cannot recover punitive damages from the City.[141]

Though defendants filed a reply, they don't address plaintiffs' argument that, under their version of events, a reasonable jury could find that the officers acted with reckless indifference to plaintiffs' Fourth Amendment rights.[142]  If plaintiffs' full account of what happened is believed,[143] then a reasonable jury could conclude that Maalouf and Snyder's conduct in shooting plaintiffs' dogs to death involved reckless or callous indifference to plaintiffs' rights. So, defendants' motion for summary judgement on plaintiffs' demand for punitive damages is denied with the caveat that plaintiffs cannot seek an award of such damages against the City.

---

[139] ECF No. 164 at 28.

[140] ECF No. 187 at 46.

[141] *Id.* at 47 n.14.

[142] *See generally* ECF No. 204.

[143] For example, a jury deems plaintiffs' testimony and that of their expert more credible than the officers' and their expert's testimony and if plaintiffs' evidence is given greater weight than defendants' evidence.

**Conclusion**

Accordingly, IT IS HEREBY ORDERED that:

- Plaintiffs' objections **[ECF Nos. 184, 202]** to Calderon's report and interior photographs Bates stamped NLV MSJ PHO 19–30, which were provided by defendants to support their summary-judgment arguments,[144] are **SUSTAINED**. Plaintiffs' requests to strike those exhibits are **DENIED**; the court did not consider them in determining the parties' summary-judgment motions. Plaintiffs' other evidentiary objections are **OVERRULED**.

- The competing motions for Rule 11 sanctions **[ECF Nos. 199, 206] are DENIED**.

- Plaintiffs' motion for summary judgment **[ECF No. 166] is DENIED.**

- Defendants' motion for summary judgment **[ECF No. 164] is GRANTED in part:** summary judgment is granted in favor of defendants on plaintiffs' negligent-infliction-of-emotional-distress claim and in favor of the City on plaintiffs' claims for *Monell* liability and negligent training, supervision, and retention under Nevada law. Plaintiffs may not seek punitive damages from the City. The motion is **DENIED** in all other respects. Accordingly, plaintiffs may proceed only on their unreasonable-seizure claim against Maalouf and Snyder and their intentional-infliction-of-emotional-distress claim against all defendants.

IT IS FURTHER ORDERED that **this case is REFERRED to the magistrate judge for a mandatory settlement conference.** The parties' obligation to file their joint pretrial order is **STAYED** until 10 days after that settlement conference.

_____

U.S. District Judge Jennifer A. Dorsey
May 30, 2019

---

[144] ECF Nos. 165-9, 185-9.